UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SANDINO CAMPBELL,

                    Petitioner,

          -against-

DOWNSTATE CORRECTIONAL FACILITY,

                    Respondent.
----------------------------------------------------------------X

__For Online Publication Only__

**MEMORANDUM AND ORDER**
19-CV-2448 (JMA)

FILED
CLERK

1:50 pm, Nov 22, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES:**

Sandino Campbell
       _Pro se_ Petitioner

Yael V. Levy, Assistant District Attorney
Nassau County District Attorney's Office
262 Old Country Road
Mineola, NY 11501
       *Attorneys for Respondent*

**AZRACK, United States District Judge:**

      On March 26, 2015, following a jury trial in state court, Sandino Campbell ("Campbell") was convicted of one count of Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree. On April 28, 2015, Campbell was sentenced to an indeterminate sentence of twenty-five years to life imprisonment on the Murder in the Second Degree count, and to two determinate terms of fifteen years imprisonment and on the Criminal Possession of a Weapon in the Second Degree counts, with all sentences to run concurrently.

      Campbell, proceeding pro se, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising various grounds for relief. For the following reasons, all of Campbell's proffered grounds are either procedurally barred or without merit. Therefore, the petition is DENIED in its entirety.

# I.  BACKGROUND

## A. __Factual Background__

The following facts are taken from the petition and the state court record.[1]

The evidence at trial demonstrated that, in the early morning hours of May 16, 2009, Campbell shot and killed Galy Fortune ("Fortune") following an altercation at the nightclub Moments in Elmont, Nassau County.

On the evening of May 15, 2009, Campbell and Kimesha Wildman ("Wildman"), the woman he was dating at the time, met up with friends Sanjay Cato ("Cato") and Jenah Bell ("Bell") at the Nagasaki nightclub in Hempstead, New York to celebrate Wildman's birthday.  (Tr. 434-35, 527-30, 717-19.)  Eventually, the group left Nagasaki and went to Moments nightclub in Elmont.  (Tr. 436.)  Cato and Bell drove together and Campbell took Wildman in his gray car, and both Cato and Campbell parked in the rear parking lot behind Moments nightclub.  (Tr. 436, 530, 720.)  The group entered the club at approximately 2:45 a.m. after Cato, a longtime patron, and VIP at Moments, spoke with the supervisor of security, Darrell Midgette ("Midgette").  (Tr. 355, 358, 368-69, 468, 531-32, 720-21.)

Fortune was also a frequent patron of Moments nightclub.  (Tr. 177.)  Just after midnight on May 16, 2009 Fortune went to Moments, as he did most weekends.  (Tr. 177.)  Inside the club, Cato, Bell, Campbell, and Wildman were standing at the back of the club near the dance floor.  Fortune approached the group and put his hand on Wildman's rear end.  (Tr. 441-45, 535-39, 721-23.)  Cato grabbed Fortune's arm and asked him what he was doing as Cato, Fortune, Campbell, and others engaged in a scuffle of pushing back and forth, although no punches were thrown.  (Tr. 441-45, 535-39, 721-23.)  Security at the club intervened quickly and separated the individuals.

---

[1] "Tr." refers to the trial transcript, People v. Campbell Trial Tr., March 11, 16-20, 24-26, 2015.  "S." refers to the transcript for the sentencing proceedings, People v. Campbell S. Tr., April 28, 2015.

Campbell grabbed Wildman by the hand and took her out of the back entrance to the club. (Tr. 723-34.)  Security guard Robert Lloyd ("Lloyd") followed Campbell and Wildman to the parking lot, confirmed that everything was alright, and watched them enter a silver or gray vehicle and drive away.  (Tr. 398-400, 415-18.)  Lloyd also observed Cato and Bell leave the club and get into their car.  (Tr. 399, 418-19.)  Both Lloyd and Midgette walked Fortune to the front exit of the club and spoke to him about the incident; Fortune shared that he exchanged words with a man over a woman, but that the argument was not physical.  (Tr. 359-60, 400-01.)  Fortune left the club.

Campbell and Wildman left Moments and drove to the gas station across the street from the club; while Campbell was pumping gas, Cato and Bell arrived.  (Tr. 446, 541-43, 724.)  Campbell was calm and told Cato he was going home.  (Tr. 541-43.)  Cato then returned to Moments and parked in front of the club.  (Tr. 541-43).

Fortune began walking away from the club on Elmont Road to where he had parked his car.  (Tr. 362-63, 404, 425.)  Campbell, who had left the gas station and was driving past the club, told Wildman "that's the guy" in Jamaican patois.  (Tr. 724-25.)  Campbell slowed the car, told Wildman to lower her window and put her head down; she complied.  (Tr. 744.)  Wildman said "you don't have to do this" as she heard three loud bangs over her head.  (Tr. 744-45.)  Campbell dropped the gun on the floor of the car by his feet and drove away.  (Tr. 750.)

Security guards Lloyd and Midgette were also at the scene of the shooting.  They were standing outside Moments when they each heard an engine revving or a loud muffler, and each observed a gray car drive down Elmont Road and slow down.  (Tr. 363, 405-06.)  Lloyd observed that the car was similar to the vehicle he saw Campbell get into when he spoke with him earlier. (Tr. 406.)  After the car slowed down, Lloyd and Midgette heard three to four gunshots and ducked down.  (Tr. 363-64, 405.)  When they looked up, Fortune was walking and then fell on his face on

3

the ground.  (Tr. 363, 405.)  Lloyd and Midgette ran to Fortune and found him to be unresponsive and laying on the ground gasping for air.  (Tr. 363, 405.)  James White, another patron of the club, also ran to Fortune's aid and waited until the police arrived.  (Tr. 620, 623.)  An ambulance arrived and transported Fortune to North Shore University Hospital, where Fortune was pronounced dead from gunshot wounds.  (Tr. 200-03, 267.)

A couple of weeks after the shooting, Campbell fled to California.  (Tr. 736-37.)  Wildman later followed and moved into an apartment with Campbell.  (Tr. 737-740.)  In July 2009, police came to the apartment Wildman shared with Campbell, but Wildman did not tell them anything about the events of May 16, 2009.  (Tr. 741.)  A while later, Wildman returned to New York and police officers waiting for her at the airport took her to the District Attorney's office.  (Tr. 742.)  After consulting with an attorney, Wildman gave a statement to the District Attorney's office regarding the events of May 16, 2009.  (Tr. 743.)  Following Wildman's statement, Campbell was arrested in California on June 19, 2010.  (Tr. 830-31.)

Campbell was tried and convicted of one count of Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree.  Campbell appealed the September 21, 2011 judgment of conviction, and on November 13, 2013 the Appellate Division, Second Department, reversed the judgment and ordered a new trial.  People v. Campbell, 111 A.D.3d 760 (N.Y. App. Div. 2d Dep't 2013).  In reversing Campbell's conviction, the Second Department found that the trial court had erred in denying defense counsel's application to discharge a prospective juror for cause.  Campbell, 111 A.D.3d at 761.  The prospective juror had made several comments that demonstrated doubt that the juror could be impartial, and, as such, should have been struck for cause.  This juror was not ultimately seated on the jury as Campbell used one of his preemptory challenges on the juror.  The Appellate Division, however, found that

4

this error was not harmless because defense counsel exhausted his preemptory challenges as a result. Id.

Campbell's retrial began on March 11, 2015 before the Hon. Alan L. Honorof.  At trial, the prosecution presented witness testimony from Fortune's widow, the two security guards (Lloyd and Midgette), White, Cato, Bell, and Wildman.  The prosecution also presented video surveillance from the evening of the shooting showing Campbell, Wildman, Bell, and Cato in Moments nightclub prior to the shooting.

At trial, White testified that, after leaving the club with his girlfriend, they were sitting in his car parked on Elmont Road across the street from Moments.  (Tr. 615.)  White heard the sound of a loud car engine and saw a gray car stop on Elmont Road.  (Tr. 616.)  White saw the driver, who he identified as Campbell at trial, point a gun out of the passenger side window and fire several shots at a man on the sidewalk before driving away.  (Tr. 616-18.)  During cross examination, White was pressed by defense counsel about his earlier statements and testimony at the first trial, his reluctance to testify again, and White's own prior conviction for public lewdness. During these exchanges, White made certain statements concerning the first trial, including two somewhat ambiguous statements about a "conviction" and a "new trial.".  (Tr. 632, 635, 636, 660.)

After the prosecution rested, the defense did not present a case.  (Tr. 905.)  Campbell was found guilty of Murder in the Second Degree, Penal Law § 125.25(1), and two counts of Criminal Possession in the Second Degree, Penal Law §§ 265.03(1), (3).  On April 28, 2015, Campbell was sentenced  to an indeterminate sentence of twenty-five years to life imprisonment on the Murder in the Second Degree count, and to two determinate terms of fifteen years imprisonment and five years of post-release supervision on the Criminal Possession of a Weapon in the Second Degree counts, with all sentences to run concurrently.  (S. 7-8.)

**B. Post-Conviction Proceedings**

**1. The Direct Appeal**

In August 2016, Campbell appealed his conviction to the Second Department of the New York State Appellate Division.  On appeal, Campbell argued that he was denied his right to a fair trial and should have been granted a mistrial,  after White referenced his prior conviction at the first trial.  Campbell also argued that this testimony warranted reversal because the trial court failed to question the jurors as to the prejudicial effect of White's testimony.  Campbell also argued:  (1) he was denied the effective assistance of counsel when defense counsel failed to request an accomplice charge for Kimesha Wildman; (2) the verdict was against the weight of the evidence; and (3) his sentence was excessive.  (See Def.'s App. Br., August 2016 ("App. Div. Br."), at ECF pp. 26-48, ECF No. 7-1.)

Later, on February 17, 2017, Campbell filed a pro se supplemental brief, in which he argued that: (1) he was denied due process when the prosecution failed to timely serve an identification notice pursuant to C.P.L. § 710.30(10(b); and (2) defense counsel provided ineffective assistance when he failed to object to untimely identification notice.  (See Def.'s Pro Se Supp. App. Br., February 17, 2017, ("Supp. App. Div. Br."), at ECF pp. 7-12, ECF No. 7-3.)

The Second Department affirmed Campbell's conviction.  People v. Campbell, 158 A.D.3d 723 (N.Y. App. Div. 2d Dep't 2018).  With regards to Campbell's claim that that trial court erred by denying his motion for a mistrial and not sua sponte polling the jury, the Second Department found these claims were "unpreserved for appellate review and, in any event, without merit."  Id.

With regard to the claim that defense counsel was ineffective for failure to request an accomplice charge for Wildman, the Appellate Division found that the claim was without merit, and that "[t]here was no basis for the Supreme Court to give an accomplice charge because there

6

is no evidence in  the record which would support a finding that the witness was an accomplice[]" and, thus, "counsel was not ineffective for failing to request such a charge." Campbell, 158 A.D.3d at 723 ( citations omitted).  With respect to the identification notice claims, the Appellate Division found that Campbell's claim was not preserved for appellate review, and, in any event, was without merit because "the People timely served the defendant with proper notice pursuant to C.P.L. 710.30 and, even in the absence of such notice, the statutory exception to the rule requiring preclusion of the subject identification evidence would have applied, as the defendant moved for suppression of the identification evidence and that motion was denied." Campbell, at 724 ( citations omitted).  The Appellate Division also found that Campbell's claim that defense counsel was ineffective for failing to raise an objection as to timeliness was also without merit. Id.

On April 26, 2018, the New York State Court of Appeals denied Campbell's request for leave to appeal.  People v. Campbell, 31 N.Y.3d 1012 (N.Y. 2018).

## 2.  The Instant Petition

Campbell filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 22, 2019, asserting the following grounds for relief:  (1) the trial court's refusal to grant a mistrial and failure to question the jurors after White's testimony about the prior trial violated Campbell's right to a fair trial; (2) defense counsel provided ineffective assistance by failing to request an accomplice charge for witness Kimesha Wildman; (3) the prosecution failed to timely serve an identification notice pursuant to C.P.L. § 710.30(1)(b); and (4) defense counsel provided ineffective assistance by failing to object to untimely identification notice.  (See Pet. at ECF pp. 5-9.)  For the reasons discussed below, all of Campbell's claims are either procedurally barred or without merit.  Thus, the instant petition is DENIED in its entirety.

## II. DISCUSSION

### A.  <u>Standards of Review</u>

**1. Overview of AEDPA**

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners."  <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring).  Under AEDPA, a prisoner may file a habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  To make that showing, the petitioner must demonstrate: (1) the exhaustion of state remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions.  <u>See</u> <u>id.</u> § 2254.

**2. Exhaustion**

A court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts.  28 U.S.C. § 2254(b)(1)(A).  This requirement first allows state courts the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'"  <u>Jackson v. Edwards</u>, 404 F.3d 612, 619 (2d Cir. 2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).  Thus, a petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered.  <u>Daye v. Att'y Gen. of N.Y.</u>, 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc).  Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'"  <u>Jackson v. Conway</u>, 763 F.3d 115, 133 (2d Cir. 2014) (quoting <u>Carvajal v. Artus</u>, 633 F.3d 95, 104 (2d Cir. 2011)).

8

### 3. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."  Martinez v. Ryan, 566 U.S. 1, 9 (2012).  A procedural rule is adequate if it is "firmly established and regularly followed by the state in question."  Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotations omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 261-63 (1989) (internal quotations omitted).

This procedural bar applies even if the state court addressed a claim's merits in the alternative, but also decided that claim on independent procedural grounds.  Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).  When a state court has dismissed a claim based on a state procedural rule, the petitioner is procedurally barred from raising that claim in a § 2254 petition unless the petitioner can meet certain exceptions discussed below.

To overcome a procedural bar a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider

the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750.  To demonstrate cause, a petitioner must put forth that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials . . . made compliance impracticable."  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted).  A petitioner may also satisfy the cause requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation.[2]  <u>See</u> <u>Tavarez v. Larkin</u>, 814 F.3d 644, 650 (2d Cir. 2016); <u>Restrepo v. Kelly</u>, 178 F.3d 634, 640 (2d Cir. 1999).

To demonstrate prejudice, the petitioner "must establish … that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>Torres v. Senkowski</u>, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotations omitted).

Even if a petitioner cannot establish cause and prejudice, a federal court may excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result.  For example, a petitioner can overcome a procedural bar by showing "that he is actually innocent of the crime for which he has been convicted." <u>Dunham v. Travis</u>, 313 F.3d 724, 730 (2d Cir. 2002) (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995)).  To prevail, the petitioner must put forth "new reliable evidence … that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." <u>Schlup</u>, 513 U.S. at 324.

---

[2]  "Although a claim of ineffective assistance of counsel may constitute cause and prejudice, the petitioner must have exhausted the ineffective assistance claim in state court."  <u>DeJesus v. Noeth</u>, No. 19-CV-1028 (BMC), 2019 WL 1459043, at *6 (E.D.N.Y. Apr. 2, 2019) (citing <u>Edwards</u>, 529 U.S. at 450-51).

### 4. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring). A decision involves an "unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam)). This standard is "'difficult to meet,'" and for good reason. White v. Woodall, 134 S. Ct. 1697,

1702 (2014) (quoting <u>Metrish v. Lancaster</u>, 133 S. Ct. 1781, 1786 (2013)), <u>reh'g denied</u>, 134 S. Ct. 2835 (2014).   A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Id.</u> at 1702.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Lynn v. Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006).   A state court's findings of fact will be upheld "'unless objectively unreasonable in light of the evidence presented in the state court proceeding.'"  <u>Lynn</u>, 443 F.3d at 246–47 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003)).  Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  <u>Williams,</u> 529 U.S. at 389.

**5. <u>Pro Se</u> Status**

A petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated."  <u>Jones v. Vacco</u>, 126 F.3d 408, 415 (2d Cir. 1997). However, in light of Campbell's <u>pro se</u> status, the Court construes his submissions liberally and interprets them "'to raise the strongest arguments that they suggest.'"  <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 224 (2d Cir. 2014) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).  This liberal interpretation of the petition "'does not exempt a party from compliance with relevant rules of procedural and substantive law.'"  <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983) (quoting <u>Birl v. Estelle</u>, 660 F.2d 592, 593 (5th Cir. 1981)).

B. **Claims for Relief**

As stated above, Campbell seek habeas relief on the following grounds:  (1) the trial court's refusal to grant a mistrial and failure to question the jurors after White's testimony about the prior trial violated Campbell's right to a fair trial; (2) defense counsel provided ineffective assistance by failing to request an accomplice charge for witness Kimesha Wildman; (3) the prosecution failed to timely serve an identification notice pursuant to C.P.L. § 710.30(1)(b); and (4) defense counsel provided ineffective assistance by failing to object to untimely identification notice. For the following reasons, the petition is DENIED in its entirety.

1.   **Fair Trial Claims Concerning White's Testimony**

In his petition, Campbell raises two arguments asserting that White's testimony about Campbell's first trial and conviction denied him his right to a fair trial.  Campbell contends that the trial court erred when it:  (1) denied his motion for a mistrial; and (2) failed to conduct question jurors as to whether they were prejudiced by White's statements.  (Pet. at ECF p. 5.)  For the reasons stated below, Campbell's trial court error claims are denied in their entirety.

As an initial matter, Campbell raised both these claims on direct appeal.  The Appellate Division found both claims "unpreserved for appellate review and, in any event, without merit." Campbell, 158 A.D.3d at 724.  While defense counsel did object to references to Campbell's first trial and conviction made by witness James White and moved for a mistrial, (Tr. 684), defense counsel did not request that the trial court poll the jury—either during and after the trial—as to whether they had been prejudiced by White's statements.  As such, the juror-inquiry branch of Campbell's claim is procedurally barred.  However, his mistrial claim appears to have been properly preserved for appellate review.  Accordingly, the Court assumes that the mistrial claim is not procedurally barred from habeas review.  In any event, as an alternate holding, the Appellate

13

Division also found that both branches of Campbell's trial court error claim were without merit, and, as explained below, the Court does not find that the state court's decision on either claim was contrary to, or an unreasonable application of, clearly established federal law.

*a.  White's Testimony*

During White's cross-examination, the very first question posed by defense counsel asked White if he had reviewed any material prior to his testimony on direct.  (Tr. 629.)  When White answered that he had taken a "quick look", defense counsel pressed White further, asking what he meant by a "quick look."  (Tr. 629.)  White responded:  "a quick synopsis of everything that I said in the <u>prior trial</u> and the Grand Jury."  (Tr. 629 (emphasis added).)

In a subsequent exchange, defense counsel asked White if he had reviewed his "prior testimony in this courtroom."  (Tr. 630–31.)  White responded, "I looked at that the last time I was here", referring to his direct examination in the second trial.  (Tr. 631.)  Defense counsel then pressed the issue further, which led White to admit that he had read through his prior testimony before testifying in the second trial and that he had actually handed the copy of the testimony that he reviewed to the prosecutor as he walked into the courtroom to take the stand on direct examination in the second trial.  (Tr. 631; <u>see</u> Tr. 624–25.)  During this exchange, defense counsel explicitly asked White whether he had reviewed his "prior testimony in this courtroom."  (Tr. 630–31.)

Defense counsel did not ask that these references to the prior trial be stricken or that the trial court or the prosecution should further instruct White about his testimony on this subject.  (Tr. 629.)

The most important exchange with White—where a "conviction" is referenced—occurred a few minutes later:

Q.  Now, you knew in advance you'd be testifying, correct?

A.  Yes.

Q. You knew a couple of months in advance this would happen, correct?

A. A couple of months?

Q. Yes.

A. I didn't know -- I was told it might be likely but it probably wouldn't.  I didn't think I would be here today. I didn't think the whole thing would happen again.

Q.  You knew a few months ago that this might happen, correct?

A.  I was hoping it didn't.

Q.  That's not what I asked you.  You knew a few months ago that this might happen, correct?

A. I can't speculate, I wasn't sure if this was going to happen or not.

Q.  You were not told there was a trial coming up again a few months ago, maybe in the fall?

A.  In the fall?

Q.  Yes.

A.  No, I wasn't told a trial.

Q.  Well, you weren't told by Bobby Leake, my investigator, this case was going to trial again and you would probably have to testify?

A.  I was ducking your investigator.  He was knocking on my mom's door, my old door, my old job's door.  I was getting spooked out when you have an unknown man following you and trying to track you down.

Q.  He left his information.  He left a card, he left his information but you were ducking him because you didn't want to talk to him about the incident?

A.  This guy I never seen if my life going around my doorman and coming around my mother, in the snow, tracking her down, she was scared to death. I mean, I don't know who this guy was.

Q.  You finally spoke to him, correct?

15

A.  Yeah, I finally spoke to him and let him know exactly how I felt.   He was spooking me and my family out.

Q.  You told him you didn't want to testify is what you told him?

A.  I don't want to be involved.  I did my justice.  I did my justice, a conviction was found and we're here all over again.  I wasn't happy about it.

(Tr. 634–36 (emphasis added).)

Defense counsel then requested a sidebar where he suggested that the court give a curative instruction to the jury.  When the court told defense counsel to provide a proposed instruction, defense counsel stated that "we'll do it after."  (Tr. 636–37.)  At the sidebar, the prosecution informed the court that White had been "instructed not to say anything" about the first trial.  (Tr. 637.)

The final exchange at issue occurring while defense counsel was questioning White about his prior own conviction for public lewdness:

Q:  When you were convicted before?

A:  I got convicted of public lewdness.  I was drunk.  I did something wrong.  I was convicted for it.  I didn't get no new trial or anything like that, I was convicted.

Q:  You know something –

A:  I was wrong.

Q:  Hold on an a second.  You keep mentioning this.  No one has asked you questions and you've been admonished not to talk about it but you keep doing it.  You keep doing it.

[Prosecutor]:  Objection.

THE COURT:  Overruled.

Q:  No, you keep doing it.

A:  I don't want him yelling at me.

16

> Q:  You already said it once.  You said it for the second time about a trial.  You said it the second time.  You keep doing it.  You've been told not to say it but you keep doing it, don't you, and you're doing it to get the attention off yourself, aren't you?
>
> A:  I'm not on –
>
> Q:  Why can't we talk about your convictions?  Why do you have to keep bringing up things other than the questions?
>
> A.  I'm not on trial.  I am a witness to a murder, that's why I'm here.  I'm not the one on trial.

(Tr. 660 (emphasis added).)

As noted above, after White first referenced a "conviction," defense counsel asked for a sidebar and requested a curative instruction.  (Tr. 636-37.)  Later, after the jury had heard all the testimony cited above, Campbell moved for a mistrial, arguing that a curative instruction would be insufficient to cure the prejudice to Campbell.  (Tr. 684.)  The trial court denied Campbells' motion for a mistrial, but gave a curative instruction to the jury, stating:  "[y]ou have heard from one of the witnesses, James White, referencing a prior trial of this matter.  I hereby instruct you that any references to prior proceedings are irrelevant and not to be considered by you in any way."  (Tr. 713-14.)

Campbell did not ask the trial court, either before or after the verdict, to question the jurors about White's testimony above.

At sentencing, Campbell renewed his request for a mistrial, which was again denied.

### b.  Mistrial Claim

Campbell argues that he is entitled to habeas relief on the grounds that the trial court erred by failing to grant his motions for a mistrial based on White's testimony regarding Campbell's first trial and conviction.  (Pet. at ECF p. 5.)  This claim is without merit.

Campbell cannot establish that the Appellate Division's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law.

"Due process guarantees 'the fundamental elements of fairness in a criminal trial.'" Hayes v. Ayers, 632 F.3d 500, 515 (9th Cir. 2011) (quoting Estelle v. McGuire, 502 U.S. 62, 70 (1991)). The Supreme Court, however, has cautioned that, it has "'defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 515 (quoting Estelle, 502 U.S. at 70)

The Supreme Court has not addressed the specific scenario where at, at a retrial, the defendant's prior conviction at the first trial is referenced by a witness and the trial court issues a curative instruction directing the jury to disregard that testimony. See Yokely v. Hedgepeth, 801 F. Supp. 2d 925, 941 (C.D. Cal. 2011) (stressing—in case where the petitioner claimed that references at his retrial to his prior trial and to his "appeal" prejudiced him—that the petitioner "has failed to identify any Supreme Court precedent which holds that a fleeting mention by a witness of a prior trial or lineup which is then 'excluded by the trial court with an instruction to the jury to disregard it was nonetheless deemed prejudicial enough to undermine the fundamental fairness of a criminal trial.'" (quoting Hayes, 632 F.3d at 515)).

Moreover, Campbell's claim fails even if the Court were to assume, for the sake of argument, that it is clearly established Federal law that a defendant has a due process right to a "fundamentally fair trial" and that sufficiently prejudicial evidence before the jury can, in certain circumstances, violate that right. See Freeman v. Kaiden, 684 F.3d 30, 34–35 (2d Cir. 2012) ("A federal habeas court may, of course, review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a "fundamentally fair trial." (quoting Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004)).

In determining whether a petitioner's trial lacked the requisite "fundamental fairness," courts consider the nature of the evidence at issue and the curative instructions, if any, given by the trial court.  Yokely, 801 F. Supp. 2d at 941.  Courts also consider the strength of the evidence against the defendant.  Id.

Evidence at a retrial which indicates that a defendant was previously convicted of the same offense at his first trial could potentially be prejudicial.  However, it is notable here that White only referenced a "conviction" once and never explicitly stated that Campbell was convicted. Additionally, White never stated what offense the "conviction" was for.  White's fleeting mention of a "new trial" was also ambiguous.  In this exchange, White never explicitly stated that Defendant received a "new trial" or why.  See Yokely v. Hedgepeth, 801 F. Supp. 2d 925, 941 (C.D. Cal. 2011) (rejecting habeas claim where petitioner claimed that reference at retrial to his "appeal" indicated to the jury that he had been convicted at the first trial, but "it was not clear that the jury even understood what" the witness was referring to when he mentioned an "appeal")

Other aspects of White's testimony on cross-examination are also relevant to the analysis here.  Defense counsel's questioning opened the door to White referencing the "prior trial."  That testimony about the first trial occurred before White's "conviction" statement and Campbell did not request a curative instruction at that time.  Defense counsel also referenced prior testimony and Campbell's first trial during his cross-examination of other witnesses.  (Tr, 481–83, 497 (Bell); Tr. 564 (Cato); Tr. 763–65, 796 (Wildman)).  Notably, during Bell's cross-examination—which occurred before White's testimony—defense counsel questioned Bell about his prior testimony in "this courtroom" and before the same judge.  (Tr, 481–83, 497.)  These repeated references to the prior trial—which were elicited by defense counsel—show that the jury was already well aware there was a prior trial.

Additionally, White's statement about the "conviction" was attributable to the strategy defense counsel pursued in questioning White.  Defense counsel opened the door to this testimony by pressing White about his reluctance to testify at the second trial.  White had no prior relationship with either the victim or Campbell and testified that he had gotten involved in the police investigation against the wishes of his girlfriend, who told him at the scene to leave and not to get involved.  (Tr. 623.)  White's frustration and reluctance about testifying in the second trial was not surprising.  Defense counsel ran the risk of eliciting testimony about the first trial and the result of that trial by prodding White so forcefully on this point.  The Court also notes that, rather than simply ignoring White's ambiguous "new trial" statement, defense counsel chose to press the issue further, in a deliberate and strategic attempt to use White's response to attack his credibility.

The actions of defense counsel cited above weigh against finding a due process violation here.  Moreover, even putting those points aside, the potential prejudicial effect of White's statements was sufficiently addressed by the trial court's strong curative instruction.  See Yokely, 801 F. Supp. 2d at 941 ("[A]ny potential prejudice to Petitioner was cured by the trial court's striking the testimony and instructing the jury to disregard it.").

There is no evidence that White's testimony rendered Campbell's trial unfair in light of the curative instruction issued by the trial court.   A jury is generally presumed to follow a trial court's instructions.  See Greer v. Miller, 483 U.S. 756, 767 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions,… and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." (citations omitted); Scarlett v. United States, No. 10-CR-809 (KAM). 2021 WL 2809818, at *16 (E.D.N.Y. July 6, 2021) ("[The Second Circuit has held [in federal criminal cases]

that the prejudicial nature of witness testimony can be redressed through striking the problematic testimony and issuing limiting instructions for the jury.").

Here, there is no reason to believe that the jury could not follow the trial court's instruction to disregard White's statements, and, further, no likelihood that anything he said was devastating to Campbell's defense.  See U.S. v. Deandrade, 600 F.3d 115, 119 (2d Cir. 2010) citing United States v. Castano, 999 F.2d 615, 618 (2d Cir. 1993) (concluding that it was "extremely unlikely" that improperly admitted evidence contributed to the guilty verdict because "[t]he introduction of the evidence was inadvertent [and] ... the prosecution did nothing to emphasize the statements at the time they were made, and never referred to them thereafter").

The trial court's decision to deny Campbell's request for a mistrial and to instead issue curative instructions was reasonable.  "'The Supreme Court long has recognized that the conduct of the trial is regulated under the sound discretion of the trial judge, . . . and the trial court is in the best situation to intelligently determine if a mistrial is necessary.'" Pellis v. Wright, No. 19-CV-00149, 2022 WL 3587755, at *7 (W.D.N.Y. Aug. 22, 2022) (quoting Glenn v. Wynder, No. 06-CV-513, 2012 WL 4107827, at *15 (W.D. Pa. Sept. 19, 2012)).

Finally, the evidence against Campbell was overwhelming.  The trial was not fundamentally unfair and any error was harmless.  See Yokely, 801 F. Supp. 2d at 941 ("[A]ny possible error in the jury hearing a few fleeting references to a prior trial or a lineup was harmless given the strong evidence at trial of Petitioner's guilt through the eyewitness testimony of [the prosecution's two key witnesses]."); cf. Newkirk v. Capra, 615 F. App'x 712, 714 (2d Cir. 2015), as amended (Sept. 21, 2015) (denying habeas relief—where witness's testimony violated the "trial court's pre-trial evidentiary ruling that the state could not present evidence of [the defendant's] past sexual abuse of [the victim]"—because, inter alia, the victim's "testimony regarding the

21

charged conduct was also corroborated by DNA evidence, further supporting the state court's conclusion that the impermissible testimony did not contribute to the verdict").

Campbell points to certain inconsistencies in White's statements and testimony regarding the shooter.  However, the prosecution did not rely solely on White.  Wildman was in the car when the shooting occurred and then subsequently fled to California with Campbell.  The evidence against Campbell, including the testimony of White, Wildman, the other witnesses, and the video surveillance evidence, was, when considered together, overwhelming.[3]

Accordingly, Campbell's claim that the trial court erred by failing to grant counsel's motion for a mistrial is denied.  Campbell cannot demonstrate that the state court's ruling was contrary to, or in violation of, established federal or constitutional law or was an unreasonable determination of the facts.

### c. Juror-Inquiry Claim

Campbell asserts that he was denied a fair trial on the grounds that the trial court failed to poll the jury and question them regarding the potential prejudicial effect of White's testimony concerning the prior trial and the "conviction."  (Pet. at ECF p. 5.)  As discussed above, Campbell's claim was not preserved for appellate review, and the state court "expressly relied on a procedural default as an independent and adequate state ground" in denying Campbell's unpreserved claim. Velasquez, 898 F.2d at 9.  The Appellate Division also found, in the alternative, that this claim failed on the merits.

---

[3]  The Court's conclusion that the evidence against Campbell was overwhelming and that any error by the trial court concerning White's testimony would have been harmless is further buttressed by Campbell's conviction at the first trial where none of the allegedly prejudicial testimony at issue here was introduced.  A prior jury found him guilty and that verdict was overturned on what can be characterized as a technicality.  Notably, the prospective juror whose impartiality was questioned and who was the subject of Campbell's appeal did not ultimately sit on the jury.

To overcome the procedural bar, Campbell must demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 750.  Campbell has not shown cause for the default and actual prejudice, or that failure to consider his juror-inquiry claim will result in a fundamental miscarriage of justice.  Thus, Campbell cannot overcome this procedural bar.  In any event, this claim also fails on the merits.

On this record, there is no basis for the Court to find that the Appellate Division's rejection of Campbell's juror-inquiry claim was contrary to, or an unreasonable application of federal law.

This Court has found no authority indicating that clearly established Federal law required the trial court to sua sponte question the jurors about the potential prejudicial effect of White's testimony.

Moreover, it cannot be said that the trial court's failure to make such an inquiry rendered the trial fundamentally unfair.  First, even assuming, for the sake of argument, that sufficiently prejudicial testimony could, in some circumstances, necessitate questioning jurors, such questioning was not necessary here given the nature of White's testimony and the trial court's curative instruction.  Given the circumstances here, it was surely within the trial court's discretion not to sua sponte question the jurors about White's testimony.  Inquiring into this issue during trial could have risked magnifying any potential prejudice by focusing the jurors' attention on these two fleeting statements.  Moreover, questioning the jurors about this issue after their verdict would have raised additional concerns as courts are generally reluctant, absent extraordinary circumstances, to question jurors about their deliberations and verdict.  Notably, this was not a situation where one or more jurors were exposed to potentially prejudicial information about a case outside the courtroom—such as by reading articles in the press.  Here, all the allegedly

prejudicial information was elicited during White's testimony in court.  Due process did not require that the trial court question the jurors about White's testimony.

For the reasons stated above, Campbell's claim that the trial court erred by failing to conduct a juror-inquiry is without merit.  Campbell cannot establish that the state court's ruling was contrary to, or in violation of, established federal or constitutional law or was an unreasonable determination of the facts.

### 2.  Ineffective Assistance of Counsel Claim Concerning Accomplice Charge

Campbell claims that trial counsel was ineffective for failing to request an accomplice charge for Kimesha Wildman.

#### a.  Standard for Ineffective Assistance

As a general principle, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, 466 U.S. 668, 689 (1984).  After all, "there are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. In reviewing the totality of the evidence, the Court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 134 S. Ct. 10, 13 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)). Bearing in mind this deferential standard, it is no surprise that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail.  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

To establish deficient performance, a petitioner must prove that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.  But even if the petitioner can show deficient performance, he must also establish prejudice – that is, "there is a

24

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

### b. Failure to Request Accomplice Charge

Campbell asserts that he is entitled to habeas relief on the ground that defense counsel was ineffective for failure to request an accomplice jury charge for Kimesha Wildman. (Pet. at ECF p. 6.) Campbell argues that but for counsel's failure to request the charge, Wildman's testimony would have been precluded. (Id.) Campbell's claim fails.

On direct appeal, the Appellate Division held that Campbell's claim was without merit and that counsel would not be found ineffective for failure to "pursue an argument that [had] little to no chance of success." Campbell, 158 A.D.3d at 723. The Appellate Division further held that "[t]here was no basis for the Supreme Court to give an accomplice charge because there is no evidence in the record which would support a finding that the witness was an accomplice." Id. The Court finds that the Appellate Division's finding was not contrary to, nor an unreasonable application of, clearly established federal law.

Under New York law, "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense." C.P.L. § 60.22(1). An accomplice is defined as "a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in: (a) the offense charged; or (b) an offense based upon the same or some of the same facts or conduct which constitute the offense charged." C.P.L. § 60.22(2).

According to Wildman's testimony, Campbell identified Fortune as the man who touched her in the nightclub, told her to put her head down, and fired a gun over her head out of the

passenger side window of the vehicle as Wildman told him "you don't have to do this." (Tr. 727.) Thus, the evidence adduced at trial does not support that Wildman participated in the offense charged. According to Wildman, club security, and Cato, Campbell appeared calm after they left the nightclub, and there was no indication that Campbell would react by firing a loaded gun at Fortune.

Campbell is unable to demonstrate that counsel's failure to request an accomplice jury charge for Wildman constituted deficient performance. It is well settled under <u>Strickland</u> that "the failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner [i]s entitled." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 99 (2d Cir. 2001). Even if counsel had requested an accomplice charge, there is not a reasonable probability that such a request would have been granted.

Additionally, the Court notes that requesting an accomplice charge would have contradicted defense counsel's trial strategy. As a general rule, "actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance" of counsel. <u>United States v. Best</u>, 219 F.3d 192, 201 (2d Cir.2000) (quoting <u>Strickland</u>, 466 U.S. at 689). Counsel's defense theory was that another individual was responsible for shooting Fortune. (Tr. 931.) By requesting an accomplice charge, counsel would have effectively conceded that Campbell was responsible for the shooting and Wildman participated in the crime. As such, defense counsel was ineffective for not requesting an accomplice charge that would have undermined the defense theory at trial.

Further, Campbell is unable to demonstrate that he was prejudiced by counsel's failure to request an accomplice charge. In his petition, Campbell argues that but for counsel's failure to request the accomplice charge, Wildman's testimony would have been precluded. However, even

if counsel were to prevail on obtaining an accomplice charge, it would not have resulted in Wildman's testimony being precluded.  Rather, the jury would simply have been instructed that Campbell could not be convicted based on Wildman's testimony alone, and that a conviction would need to be supported by corroboration.  C.P.L. § 60.22(1).  Here, Wildman's testimony regarding the shooting was supported by witness James White, and other events before and after the shooting were corroborated by the testimony of numerous other witnesses, and video surveillance.  Given this evidence, there is not a reasonable probability that, even if an accomplice instruction had been given, that the jury would have reached a different.  Thus, Campbell is unable to demonstrate that he was prejudiced by counsel's performance.

Accordingly, Campbell's ineffective assistance claim is denied.  Campbell cannot establish that the state court's rejection of this ineffective assistance claim was contrary to, or in violation of, established federal or constitutional law or was an unreasonable determination of the facts. Ineffective Assistance of Counsel Claim Concerning Accomplice Charge

### 3.  Alleged Untimely Identification Notice and Related Ineffective Assistance Claim

Campbell argues that the prosecution failed to serve timely an identification notice, as required by C.P.L. § 710.30(1)(b).  (Pet., at ECF pp. 8-9.)  Relatedly, Campbell also argues that defense counsel was ineffective for failing to object to the untimely notice.  For the reasons that follow, these claims are denied.

### a.  Untimely Notice Claim

As an initial matter, Campbell's claim that the prosecution failed to serve a timely C.P.L. § 710.30 notice is procedurally barred because the Appellate Division denied this claim on adequate and independent state procedural grounds.  The Appellate Division held that Campbell's claim that the prosecution failed to timely serve identification notice was "unpreserved for

appellate review." Campbell, 158 A.D.3d at 724.   The Appellate Division also found that Campbell's claim was without merit.   Id.   Because Campbell failed to preserve his claim for appellate review, and because he has failed to demonstrate cause for the default and actual prejudice, or that failure to consider this claim will result in a fundamental miscarriage of justice, his claim is procedurally barred.[4]

Even if this claim were not procedurally barred, it would still fail because an allegedly defective C.P.L. § 710.30 notice does not present a constitutional issue subject to federal habeas corpus review.   See, e.g., Brown v. Harris, 666 F.2d 782, 785 (2d Cir. 1981) ("[A]ppellant claims that it was reversible error to admit the identification testimony without giving him advance notice [under § 710.30].... Brown cites no case indicating that this statute, or that a notice requirement in general, is constitutionally mandated."); Scrubb v. LaValley, No. 10-CV-3286, 2015WL4251238 at *3 (E.D.N.Y. July 13, 2015)("[C]ourts have routinely concluded that a '[v]iolation of the notice requirement of New York Criminal Procedure Law § 710.30 is purely a matter of state law and raises no constitutional issues for a habeas court to review.' "); Dotson v. Ercole, 06-CV-7823, 2009WL1615997 at *2 (S.D.N.Y. June 9, 2009) ("Even if the admission of the testimony at issue did contravene C.P.L. § 710.30(1), such an admission does not constitute a constitutional violation. The Constitution does not guarantee a right to advance notice of identification testimony."); Roberts v. Scully, 875 F. Supp. 182, 191 (S.D.N.Y.1995) (violation of § 710.30 does not "reflect a claim of constitutional magnitude"), aff'd, 71 F.3d 406 (2d Cir. 1995).

Accordingly, Campbell's identification notice claim is not cognizable on habeas review, and, as such, he is not entitled to habeas relief.

---

[4] As explained below, while Campbell claims that his counsel was ineffective for not raising this issue, that ineffective assistance claim is meritless.

### b. *Ineffective Assistance Claim Concerning the Allegedly Untimely Notice*

Campbell claims that defense counsel was ineffective for failing to object to the identification notice.  (Pet. at ECF p. 9.)  Before the Appellate Division, Campbell raised, in his pro se supplemental brief, his underlying challenge to the allegedly defective notice as well as a related ineffective assistance claim.

C.P.L. § 710.30(1)(b) provides, in pertinent part, that

> Whenever the people intent to offer at a trial … testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him or her or a pictorial, photographic, electronic, filmed or video recorded reproduction of him or her as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.

C.P.L. § 710.30(1).

In denying Campbell's claim on the merits, , the Appellate Division found that:

> the People timely served the defendant with proper notice pursuant to C.P.L. § 710.30 and, even in the absence of such notice, the statutory exception to the rule would have applied, as the defendant moved for suppression of the identification evidence and that motion was denied.  The defendant's contention that counsel was ineffective for failing to raise an issue as to the timeliness and sufficiency of the C.P.L. § 710.30 notice is also without merit.

Campbell, 158 A.D.3d at 724 (citations omitted).

Campbell cannot prevail on an ineffectiveness claim because, as the Appellate Division correctly explained, any challenges based on an allegedly untimely notice would have failed. Campbell also cannot show prejudice because, irrespective of the timeliness or propriety of the C.P.L. § 710.30 notice, defense counsel still moved to suppress the identification evidence against him, and that motion was denied.

Accordingly, habeas relief is not warranted based upon this claim.

### III. CONCLUSION

The Court has considered all of Campbell's arguments and found them meritless. Accordingly, the petition is DENIED.[5]

A certificate of appealability shall not issue because Campbell has not made a substantial showing that he was denied any constitutional rights. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purposes of any appeal. Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk of the Court is respectfully directed to mail a copy of this Order to petitioner and to close the case.

**SO ORDERED.**

Dated:  November 22, 2023
Central Islip, New York

        /s/ (JMA)
        JOAN M. AZRACK
        UNITED STATES DISTRICT JUDGE

---

[5] On April 20, 2023, Campbell filed a letter with the Court stating that he was submitting a CPL § 440.10 motion and asked that his habeas petition be held in abeyance until he exhausts this new claim. Petitioner's letter also stated that "I need 60 days to provide you with the proper notification that such motion is being filed." This letter did not provide any details about the substance of this purported claim. On August 22, 2023, the Court "directed [Campbell] to show cause, in writing, by September 20, 2023 why the Court should grant his request for a stay and abeyance." The August 22 Order warned Campbell that if he "fails to file a response by September 20, 2023, the Court will deny his request for a stay based on his April 20, 2023 filing." Campbell did not respond to the August 22 Order and has not filed anything with the Court since his April 20 letter. Campbell's conclusory request for a stay and abeyance is denied.